COMMONWEALTH *vs.* KENNETH R. CHAPIN
(and a companion case against the same defendant).

Hampden. December 5, 6, 1955. — March 1, 1956.

Present: QUA, C.J., WILKINS, SPALDING, WILLIAMS, & WHITTEMORE, JJ.

*Practice, Criminal,* Continuance; Disclosure of evidence of Commonwealth; Examination as to mentality of defendant; Exceptions: whether error harmful; Ordering verdict. *Evidence,* Relevancy and materiality; Judicial discretion; Opinion: expert; Of sanity; Qualification of expert. *Constitutional Law,* Due process of law. *Error,* Whether error harmful. *Witness,* Expert. *Insanity.*

There was no error or deprivation of due process of law in the denial of a motion that the trial of an indictment for murder be continued from

an assigned date, which was four and one half months after the return of the indictment, for the reason that at the time of the motion several weeks before such trial date the defendant had just obtained counsel in addition to the counsel who had represented him since the indictment and needed additional time to prepare an adequate defence. [615–616]

There was no merit in a contention before this court that there had been error in the denial of a motion that the trial of a murder case in which the defence was insanity be postponed to give the defendant additional time for psychiatric and medical examinations where the contention was based on a ground which was unknown to the defendant's counsel and not brought to the judge's attention at the time of the hearing on the motion. [616]

No abuse of discretion or deprivation of due process of law would result from the denial of a motion that the trial of an indictment for murder to which the defence was insanity be postponed to allow time for further medical examinations on the ground that the defendant had been given phenobarbital which negated the results of electroencephalographic examinations of him if the evidence before the judge hearing the motion were conflicting with respect to the effect of the phenobarbital. [616–617]

There was no merit in a contention before this court that there had been error in denying a motion to continue a criminal trial from an assigned date for the reason that a witness for the defence would not be available to testify until a later date where it appeared that that witness actually attended the trial and testified in behalf of the defendant. [615, 617]

There was no error or violation of art. 12 of the Declaration of Rights of the Massachusetts Constitution in the denial of a motion by the defendant before trial of an indictment that he be furnished a copy of a voluntary written statement made by him to the police. [617–618]

G. L. (Ter. Ed.) c. 123, § 100, contains no requirement that a person under complaint or indictment for a crime must be sent to a mental institution for an examination as to his sanity. [618]

There was no abuse of discretion or error in the denial of a motion made by the defendant at the beginning of trial of an indictment for murder that the court commit him to a mental institution for the purpose of having him examined to determine his sanity where it appeared that the examination provided for by G. L. (Ter. Ed.) c. 123, § 100A, as amended, had been made, even if not made in a mental institution. [618–619]

There was no harm to the defendant nor violation of art. 12 of the Declaration of Rights of the Constitution of Massachusetts at the trial of an indictment in the exclusion as exhibits of certain reports whose contents were read in full into the record. [619]

There was no reversible error at the trial of a criminal case in the exclusion of impressions with respect to the defendant's sanity which a clinical psychologist having no medical degree formed from tests that he administered to the defendant where such impressions appeared in a written report by him later admitted in evidence. [619–621]

There was no abuse of discretion at a criminal trial in the judge's refusal to permit a clinical psychologist called by the defendant to compare the results of tests conducted by him on the defendant with the results of tests conducted by him on "hundreds" of other persons. [621]

At a criminal trial, the defendant was not harmed by the allowance of a question put to a witness for him on cross-examination where the substance of the answer sought by the question was given in answer to other questions to which there was no objection. [622]

There was no error harmful to the defendant at a criminal trial in allowing the district attorney on cross-examination to ask a question to which the answer was apparently beneficial to the defendant. [625]

At the trial of a murder case in which the defence was lack of criminal responsibility, there was no error in permitting a qualified psychiatrist called by the Commonwealth to give his opinion, formed after a study of the defendant, as to whether the defendant was sane or insane at the time he allegedly committed the crime. [625]

An assignment of error at the trial of a murder case in which the defence was insanity, in that the trial judge allowed the Commonwealth "to present to the jury [through a mental expert] the medical term and interpretation of the word 'insanity' when a different legal meaning was to be placed upon said word by the court in its charge to the jury," was without merit where no exception was taken to any part of the charge. [626]

Testimony by a physician called as a witness by the Commonwealth at a murder trial as to the number of determinations he had made in the preceding twelve years of the ability of men facing criminal complaints and indictments to distinguish between right and wrong at the time of committing crime was relevant to his qualification as a mental expert. [626]

Evidence with respect to the career of a physician who was superintendent of a State institution for mental defectives without psychosis warranted a finding that he was qualified to testify as a mental expert at the trial of an indictment to which insanity was a defence. [627]

There was no error in the denial of motions for directed verdicts of not guilty by reason of insanity at the trial of two indictments for murder where medical experts called on behalf of the Commonwealth testified that the defendant was legally responsible on an evening when he killed two children and medical experts called on behalf of the defendant testified that he then was not legally responsible. [627]

Two INDICTMENTS, found and returned on October 25, 1954.

The cases were tried in the Superior Court before *Fairhurst, J.*

*Jean R. LaCroix,* (*Maurice H. Baitler* with him,) for the defendant.

*Stephen A. Moynahan,* District Attorney, for the Commonwealth.

WILKINS, J.   On these two indictments, one for the murder of Lynn Ann Smith, and one for the murder of Steven Ross Goldberg, the defendant has been found guilty in the first degree.   In each case sentence of death was imposed, and execution of the sentence was stayed as required by G. L. (Ter. Ed.) c. 279, § 4, as appearing in St. 1935, c. 437, § 3.   The cases, which were tried together, are here upon his appeals with a consolidated summary of the record, a transcript of the evidence, and assignments of error.   G. L. (Ter. Ed.) c. 278, §§ 33A–33G, as amended by St. 1939, c. 341, and St. 1954, c. 187, § 1.

The main issue at the trial was the criminal responsibility of the defendant, a high school student eighteen years of age.   Lynn Ann Smith was a fourteen year old girl living at 53 Daviston Street, Springfield, two houses from the defendant, who lived at 63 Daviston Street.   On the evening of September 25, 1954, she was "baby sitting" near by at 860 Sumner Avenue in the home of a family named Goldberg.   She was a friend of the defendant's sister.   Asleep in the Goldberg house were Steven, aged four, and a brother Robert, aged six.   When their parents returned about 11:30 P.M. Lynn Ann and Steven had been stabbed to death.   Robert was unharmed.   There were thirty-eight wounds on the upper body and head of Lynn Ann, whose neck was fractured.   There were twenty-three stab wounds on the upper body and head of Steven, whose skull was fractured.

A confession given to the police by the defendant was received in evidence without objection.   We state the substance of that confession.   On the evening of September 25 the defendant left his home to go to a store.   He departed by a driveway back of his garage and walked along railroad tracks.   When near some stores in the neighborhood he changed his mind and went on to Sumner Avenue.   Passing the Goldberg house, he saw a light, got up on the steps, but could not see anybody within.   He went to the side of the house, and, looking in a window, saw Lynn Ann in a chair reading a book and watching television.   He went home,

got a knife, and returned by way of the railroad tracks. He went on the porch and knocked on the window. He motioned for Lynn to come to the door. "She opened the door and I had the knife in my hand, she saw it and she screamed and I had a hold of her coat. Then she got away from my grip. She tripped over the rug and fell towards the victrola. . . . [She] was on the floor in the front hall there, and then she tried to kick me away and I hit her a couple of times with the knife handle and she rolled over on her face. She got up on her knees and I hit her. I didn't hit her until she fell against the victrola and tried to kick me. I hit her with the handle. . . . She went down and then she kept hollering and screaming and I got hold of her and then she stopped, when I stabbed her. . . . It was in her back, she was crouched on the floor." Her head was toward the defendant, who "kept stabbing her in the back" several times. "Then I heard a noise like a child starting to cry." It was a little boy who was trying to get out of bed in a room off the hallway. The defendant hit and stabbed him several times in the back toward the upper part of his body. "Then I heard something and Lynn Ann was trying to get up so I stabbed her again several times and then she just slid over right flat on her face." She was lying face down halfway in the living room and halfway in the hall. "Then I hit her on the head with my bayonet and stabbed her and she went over to one side." The defendant headed toward his home. He saw a light, got scared, crossed between two houses, and went through a garden to the back door of his house. He again got scared and went around to the front, where he concealed himself under a couch cover on his porch. When it got hot in there, he went in the house. There was blood on his shirt. The defendant knew no reason for doing what he did. "She just screamed and I stabbed her. . . . It was intended to be a joke but it back-fired."

There was oral evidence that the defendant told the police that, when he went to the Goldberg home, he wore his father's soft hat and jacket and a pair of dungarees; that he had a piece of cloth tied around the knife handle so as to

leave no fingerprints; that "he went after the boy with the knife," because he was afraid that the boy would recognize him; that when he left the Goldberg house he ran out the front door, down the sidewalk on Sumner Avenue, and across the lawn of the house on the corner of Daviston Street; that between the houses at 15 and 21 Daviston Street there was a street light which he did not wish to run under for fear of being seen; that he ran into a driveway, jumped a fence, and proceeded along a path to his back door; and that later, after he entered the house by the front door, he washed the blood off his shirt, hid the knife and holder in two bags in back of a chair in his bedroom, listened to the radio, and went to bed. Other evidence was that the defendant had been a neighbor of Lynn Ann for about seven years, and was one of the pallbearers at her funeral.

The defendant filed twenty assignments of error identical in each case. Of these the tenth and eleventh are expressly waived.

1. The first assignment has to do with motions for continuance filed on January 31, 1955, and after hearing denied on February 14, 1955. The motions read: "Now comes the defendant in the above entitled case and moves that the trial of the above entitled case be continued from the assignment date of March 7, 1955, to such further time as the court may deem necessary and further cites as grounds for said request the following: 1. That additional counsel has been obtained in said case and that additional time is necessary for the preparation of an adequate defence. 2. That psychiatric and medical examinations have not been completed by the defence and that further time will be required for an adequate preparation. 3. That one of the psychiatrists employed by the defence has moved his residence and practice to the State of Florida and will not be available to testify until a later date."

We understand that the first ground is not now relied upon, but in any event there was no error in this respect. The indictments were returned on October 25, 1954, and on the following day Maurice H. Baitler, Esquire, entered his

appearances for the defendant. Jean R. LaCroix, Esquire, entered his appearances for the defendant on the date the motions were filed. The defendant had the advantage of consecutive representation by the same counsel throughout all the proceedings down to the present time.[1] There was a reasonable opportunity to prepare an adequate defence. *Lindsey* v. *Commonwealth*, 331 Mass. 1, 2. *Jones* v. *Commonwealth*, 331 Mass. 169, 171. *Powell* v. *Alabama*, 287 U. S. 45, 68–69.

The record does not disclose what was said to the trial judge in support of the second ground of the motions. In their brief counsel for the defendant urge that the denial of the motions was a deprivation of due process of law. Their contention is based upon their statement that at the time of the argument of their motions they were unaware that the defendant was being given phenobarbital, a barbiturate which they contend, and the Commonwealth denies, tended to negate the results of electroencephalographic examinations of the defendant. There was no abuse of discretion in the refusal to allow additional time for medical examinations for an alleged ground unknown to the defendant's counsel and necessarily not brought to the attention of the trial judge. See *Commonwealth* v. *Soaris*, 275 Mass. 291, 297.

The defendant's counsel nevertheless rely upon the testimony of one of their medical experts at the trial as well as upon an affidavit of the same expert made in connection with their motions for a new trial. The Commonwealth's medical evidence at the trial was directly to the contrary, as were counter affidavits of its medical experts used in connection with the motions for a new trial, which tended to show that phenobarbital was administered at the request of the defendant himself and in small doses, one quarter of a grain three times daily, and could have had no effect on the examinations. Even if the substance of this evidence and the affidavits could have been presented at the hearing of the

---

[1] It was stated at the arguments on motions for a new trial that the defendant was arrested on October 9, 1954, and that Mr. Baitler was retained on the same day.

motions to continue, the judge would not have been obliged to accept the defendant's disputed medical theory.

The third ground seems of no present importance. The reference is to Dr. Corwin, who had moved his residence from Springfield to Florida. Notwithstanding the suggestion of his unavailability made in the motions, he actually attended and testified at the trial on behalf of the defendant.

2. The second and third assignments of error relate to two substantially similar motions in each case argued and denied on March 7, 1955, the first day of the trial. One pair of motions was: "Now comes the defendant in the above entitled action and moves that the Commonwealth be ordered to produce and furnish to the defendant before trial, copies of any written statements, admissions or confessions alleged to have been signed by him which are in the possession of the Commonwealth or any of the Commonwealth's witnesses." The defendant's only authority suggested to the trial judge or to us is art. 12 of the Declaration of Rights of the Massachusetts Constitution, which reads in part: "No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defence by himself, or his counsel, at his election."

The offence was fully described to the defendant. The trial judge allowed those portions of the second pair of motions asking for particulars as to the exact time, the exact place, the manner and means of the commission of the offences, and copies of post mortem examinations of the victims. The defendant was given all the particulars to which he was entitled as of right, which were such "as may be necessary to give the defendant and the court reasonable knowledge of the nature and grounds of the crime charged." G. L. (Ter. Ed.) c. 277, § 40. *Commonwealth* v. *Lammi,* 310 Mass. 159, 161. *Commonwealth* v. *Galvin,* 323 Mass.

205, 210–211. *Commonwealth* v. *Green,* 326 Mass. 344, 349. The only portion of the second pair of motions which was denied was to require the Commonwealth to "Set forth any confessions or admissions allegedly made by the defendant on which the Commonwealth will rely in order to prove the crime." The law is settled that a defendant is not entitled to a copy of a confession. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 462, and cases cited. The defendant's counsel in his argument before the trial judge said that he was seeking to obtain only written statements. The only written statement was given on October 8, 1954, and no question has been made that it was not given voluntarily. There has been no violation of art. 12.

3. The fourth assignment is to the denial of the defendant's motions made on March 7, 1955, that "the court commit him to a mental institution for the purpose of having him examined to determine his sanity." The defendant's counsel argued to the trial judge that the examinations performed on the defendant by the Commonwealth were not performed in an institution; and asserted that "the only way that proper examinations could be made would be in a mental institution over a period of at least a minimum of thirty days." The trial judge said that the motions should have been made "long, long ago, not on the day of trial." The defendant now argues that there was an abuse of discretion in denying the motions, and apparently that there was no compliance with G. L. (Ter. Ed.) c. 123, § 100, or § 100A, as amended. This contention is without merit. There is no requirement in § 100[1] that a defendant must be sent to a mental institution. The examination provided

---

[1] General Laws (Ter. Ed.) c. 123, § 100, reads in part: "If a person under complaint or indictment for any crime is, at the time appointed for trial or sentence, or at any time prior thereto, found by the court to be insane or in such mental condition that his commitment to an institution for the insane is necessary for his proper care or observation pending the determination of his insanity, the court may commit him to a state hospital or to the Bridgewater state hospital under such limitations, subject to the provisions of section one hundred and five as it may order. The court may in its discretion employ one or more experts in insanity, or other physicians qualified as provided in section fifty-three . . . ."

Commonwealth *v*. Chapin.

for in § 100A[1] had been given. "It is an important statutory provision, but its design is to forward the administration of public justice, not to put into the hands of those charged with crime a new weapon of defence." *Commonwealth* v. *Vallarelli*, 273 Mass. 240, 249. *Commonwealth* v. *Belenski*, 276 Mass. 35, 43. *Commonwealth* v. *Cox*, 327 Mass. 609, 614.

4. Assignments 5 and 6 relate to the exclusion as exhibits of (1) a psychometric report of the defendant dated October 27, 1942, when he was six years old and in the second grade, and (2) an application on behalf of the defendant dated October 22, 1942, for an examination at the psychological laboratory. Both rulings occurred during the direct examination of one Cowing, a supervisor in the department of pupil service in the Springfield public school system. He was permitted to read both documents in full into the record, but the final step of marking them as exhibits was withheld. If we assume, without deciding, that the records themselves should have been admitted (see *Commonwealth* v. *Slavski*, 245 Mass. 405, 417; *Amory* v. *Commonwealth*, 321 Mass. 240, 252), we do not see wherein the substantial rights of the defendant have been prejudiced. See *Fisher* v. *Swartz*, *ante*, 265, 270. There was no violation of art. 12 of the Declaration of Rights.

5. Assignments of error 7, 8, and 9 arose from the exclusion of evidence during the testimony of Mr. Lanagan, a clinical psychologist in charge of the psychology department of the Northampton State Hospital who was called as a witness on behalf of the defendant. This witness, who held no medical degree, on November 4, 1954, administered six tests to the defendant at the Hampden County jail. He did so at the request of Dr. Longpre, the superintendent of

---

[1] General Laws (Ter. Ed.) c. 123, § 100A, as amended by St. 1941, c. 194, § 11, and St. 1953, c. 319, § 17, so far as material reads: "Whenever a person is indicted by a grand jury for a capital offense or whenever a person, who is known to have been indicted for any other offense more than once or to have been previously convicted of a felony, is indicted by a grand jury or bound over for trial in the superior court, the clerk of the court in which the indictment is returned, or the clerk of the district court, as the case may be, shall give notice to the department, which shall cause such person to be examined with a view to determine his mental condition and the existence of any mental disease or defect which would affect his criminal responsibility."

the Northampton State Hospital. On direct examination he testified at some length as to the tests, but, after a discussion at the bench, with no question pending the defendant's counsel was allowed to make the following offer of proof, which is the basis of the seventh assignment of error: "I offer Your Honor in asking this psychologist as to his impressions from the entire six tests which he conducted . on this defendant, which he has testified to partially up to the present time, I offer to prove that it is his impressions from these tests that there is evidence of the following conditions: '1. A personality structure involving a lack of sufficient ego controls together with strong drives of such a nature as to impel behavior which society cannot tolerate. 2. A lack of adequate comprehension of the "wrongness" of this behavior, i.e., an emotional detachment from such behavior. 3. Estrangement from people, from interpersonal relationships. 4. An element of depersonalization, i.e., feelings of unreality. 5. The occurrence of odd, distorted thinking. It is the impression of the examiner that the data indicates a psychotic adjustment and appears consistent with a schizophrenic reaction.' "

The offer of proof is taken verbatim from Mr. Lanagan's supplementary report, dated February 28, 1955, the exclusion of which forms part of the basis for assignment of error 16. The report was admitted in evidence later in the trial.

After further direct examination of Mr. Lanagan there occurred the following which is the basis of the eighth assignment of error: "Q. Now, did you form any impressions as a result of the conducting of these six tests with regard to this defendant? A. I did form a number of impressions about the defendant. Q. Would you give us those impressions without giving us any definite conclusions? DISTRICT₀ ATTORNEY: I object, if Your Honor please. THE JUDGE: Do you know what he is going to say? COUNSEL FOR THE DEFENDANT: I am afraid, Your Honor, it might be in line with the supplementary report which we have already taken up — THE JUDGE: And on which you have made an offer

of proof — then I will exclude it. COUNSEL FOR THE DE-
FENDANT: Your Honor will save my exception to that ques-
tion at this time? THE JUDGE: Yes."

The reason for these rulings of the trial judge was that
the witness was not a medical man, but an expert in psy-
chology who should not be allowed to testify in the field of
psychiatry. Since the reports were later admitted in evi-
dence during the testimony of Dr. Kibbe, a psychiatrist
called by the Commonwealth, the defendant got the benefit
of everything in the offers of proof. No reason appears why
the defendant's counsel could not have recalled Mr. Lana-
gan had it been deemed important further to interrogate
him with respect to these reports.

Still later in his direct examination Mr. Lanagan was
asked, "How did you find this patient's or this defendant's
responses compared with the responses of the hundreds of
people that you have examined in these tests?" After a
conference at the bench the following occurred: "THE
JUDGE: Let it appear that objection has been made and
the court has asked counsel to disclose to the court what
the witness is going to say and for the purposes of the rec-
ord now counsel will you just say what you understand the
witness is going to say? COUNSEL FOR THE DEFENDANT:
That the only comparable performances with those of the
defendant were those of psychotic persons. THE JUDGE:
Now, that is excluded and the exception of the defendant
is duly saved." This ruling is the subject of the ninth as-
signment of error. Wholly apart from the question of the
witness's expert qualifications, the judge in his discretion
could refuse to permit the witness to make a comparison
with the results of hundreds of other tests conducted by him.
Commonwealth v. Spencer, 212 Mass. 438, 449.

6. The twelfth assignment of error concerns a ruling which
permitted the district attorney to ask a question in cross-
examination of Dr. Solomon, a psychiatrist. The last point
to which the witness testified on direct examination was
that he did not think that the defendant knew the differ-
ence between right and wrong. At the beginning of the

cross-examination the witness testified that he recognized a distinction between mental illness and legal insanity; that mental illness is a term that psychiatrists are dealing with all the time, but that legal insanity is something psychiatrists have no cause to deal with unless they appear in a court room; and that he had testified previously in court, but had never been queried about legal insanity before. The following then occurred: "Q. You never have? A. Let me think, I haven't been in a court room for over fifteen years. I think once I was queried in such a way regarding a will case, but I have never appeared in this type of case before. Q. So you have never appeared in court for the last fifteen years as a witness, is that right? A. That's correct. Q. Then only? A. In any way. Q. . . . Now, Doctor, prior to today have you ever testified previously at any time or in any place on legal insanity? COUNSEL FOR THE DEFENDANT: I object to that, Your Honor, — what relevance would that be in this case? THE JUDGE: He may have it. COUNSEL FOR THE DEFENDANT: Your Honor will note my exception? THE JUDGE: Yes. THE WITNESS: Yes, I have so testified. Q. Now please tell us where and when. A. I testified in a case where a will was being contested. Q. I am speaking of a criminal case, Doctor. A. Criminal case? Q. Yes. A. No, I have not. Q. So that prior to this day, Doctor Solomon, you have never previously testified in a criminal case on the test of what is meant by legal insanity, is that correct? A. That's correct."

The context shows that the defendant was not harmed by allowing the answer to the question excepted to. The substance of the expected answer had just been given correctly. The answer was incorrect and harmless. The correct answer, which was wholly cumulative, was given in answer to later questions which were not excepted to. We do not intimate that the question was incompetent.

7. The thirteenth assignment of error relates to the exclusion of evidence during the redirect examination of Dr. Solomon. After he testified that he had the report and the supplemental report of Mr. Lanagan, the psychologist, re-

ferred to in our discussion of the seventh and eighth assignments of error, there was a conference at the bench. In response to a question from the judge as to what he was going to ask the witness, counsel for the defendant stated that he was going to ask whether the witness had examined the reports and the conclusions and impressions drawn by the psychologist; that the witness would testify that the tests were "of great significance or very helpful"; that he would next ask the witness to point out the parts which were significant and helpful, and he presumed that the witness would read most of both reports; that the witness had already testified that a psychologist is a very helpful colleague to any psychiatrist; that the psychologist's impressions of the tests the psychologist administers "can be used by psychiatrists and can to a certain extent be evaluated by them and that the impressions made by a psychologist are very often in some cases" corroborative of the diagnosis made by the psychiatrist. The judge then said: "I would permit you to make use of any part of that offer of proof and the evidence, except I will not permit you to carry into the record through this witness any opinion or any conclusion or any impression of the psychologist that appears in those two reports which are already marked for identification, which has anything to do with the opinion of the psychologist as to any psychosis on the part of this particular defendant . . . . When I say psychosis, I have in mind the definition which has been given to that word by this very witness, that it indicates some type of insanity as distinguished from feeblemindedness. In other words, if there is anything in there which indicates an impression of this witness as to mental disease or insanity, as such. I will not permit that psychologist's findings or conclusions to be read into the record." The following then occurred: "COUNSEL FOR THE DEFENDANT: I further offer to show, Your Honor, and I believe you've already excluded some of it, so I don't want to re-read it into the record, on the supplemental report, the psychological tests offer evidence for the following conditions: '1. A personality structure in-

volving a lack of sufficient ego control together with strong
drives of such a nature as to impel behavior which society
cannot tolerate.' Now, Your Honor excluded that, do you
still exclude it? THE JUDGE: Yes. COUNSEL FOR THE DE-
FENDANT: I realize we have been through this before, and
I don't want to labor this. I want to save my exception.
May I save my exception to that question again? THE
JUDGE: Before it was in regard to the psychologist — COUN-
SEL FOR THE DEFENDANT: Now, it is in regard to the psychi-
atrist. THE JUDGE: All right."

We construe this to mean that the defendant's counsel ex-
cepted to the exclusion of the two reports the same as had
been done when Mr. Lanagan was on the stand. These
previous rulings then became the subject of the seventh and
eighth assignments of error, and they later became the sub-
ject of the sixteenth assignment during the testimony of
Dr. Longpre. As we have already said, the reports were
ultimately admitted in evidence and it does not appear that,
had they wished, the defendant's counsel could not have
recalled Dr. Solomon or any other witness.

8. The fourteenth assignment is to a ruling on evidence
during the cross-examination of Dr. Corwin, a psychiatrist
called by the defendant. The course of the testimony was
as follows: "Q. Did he tell you that he killed the little
Goldberg boy because he was afraid that the Goldberg boy
might recognize him? A. No. Q. Would that, if he did
tell you that, would that change your diagnosis at all?
A. It would not." "Q. The fact that this man realized
that he was doing wrong by telling you that he killed the
little boy because he was afraid he might recognize him,
that would not change your diagnosis that this man did
know what he was doing? COUNSEL FOR THE DEFENDANT:
I object to the question. THE JUDGE: I will admit it. THE
WITNESS: I do not know that that is a fact. COUNSEL FOR
THE DEFENDANT: Exception please. . . . THE WITNESS: I
did not know that that is a fact. If I recall, that is not
stated in the confession. Q. Doctor, please, assuming it to
be a fact? A. It still would not change my diagnosis.

Q. The fact that this defendant would tell you that he killed someone so that that person would not recognize him as killer of the first person would not change your opinion at all as to whether or not he knew what he was doing? A. It would not."

The defendant contends that the question excepted to was in its wording based upon conclusions which were false; and that it was not a fact established in the trial that the defendant knew he was doing wrong, which was a question for the jury. The defendant was not harmed in any event. The answer appears to have been beneficial.

9. The fifteenth assignment of error is to a ruling permitting Dr. Longpre, a psychiatrist called by the Commonwealth, to testify as follows: "Q. Now, what was your opinion, doctor, after a study as to whether or not he was sane or insane at the time he committed this crime?" "A. I believe that he was sane at that time." When asked to state the reason for his objection, the defendant's counsel replied: "I believe that this testimony is of a medical man and not a legal man, it is for the court and jury to decide the legal conclusion of sanity." There was no error. *Commonwealth* v. *Rogers*, 7 Met. 500, 505. *Commonwealth* v. *Stewart*, 255 Mass. 9, 13–14. *Commonwealth* v. *Donoghue*, 266 Mass. 391, 396. *Commonwealth* v. *Clark*, 292 Mass. 409, 412. *Commonwealth* v. *Sheppard*, 313 Mass. 590, 610. *Commonwealth* v. *Lundin*, 326 Mass. 551, 557.

If the real ground of this assignment is that the answer to the question is the precise point to be determined by the jury, this is not a valid objection where the judge could find that the witness was qualified to express an opinion in the domain of professional knowledge which would be of assistance to the jury. *Poole* v. *Dean*, 152 Mass. 589, 590–591. *Coulombe* v. *Horne Coal Co.* 275 Mass. 226, 229–230. *Van Steenbergen* v. *Barrett*, 286 Mass. 400, 402–403. *Frankfeld* v. *United States*, 198 Fed. (2d) 679, 689 (C. A. 4). *Elkins* v. *State*, 250 Ala. 672, 675. *People* v. *Wilson*, 25 Cal. (2d) 341, 349. *Tongay* v. *State*, Fla., 79 So. (2d) 673, 676. *Gris-*

*more* v. *Consolidated Products Co.* 232 Iowa, 328. *Dowling* v. *L. H. Shattuck, Inc.* 91 N. H. 234, 236. *People* v. *Keough,* 276 N. Y. 141, 145. *State* v. *Powell,* 238 N. C. 527, 530. Wigmore, Evidence (3d ed.) § 1921. Ladd, Expert Testimony, 5 Vanderbilt L. Rev. 414, 423.

We have considered the ground of the objection which was made to the admissibility of the evidence. This is the only one now open. *Holbrook* v. *Jackson,* 7 Cush. 136, 154. *Coburn* v. *Moore,* 320 Mass. 116, 120. Wigmore, Evidence (3d ed.) § 18. The defendant's counsel suggests that it was "error to present to the jury the medical term and interpretation of the word 'insanity' when a different legal meaning was to be placed upon said word by the court in its charge to the jury." We are not sure that this suggestion is of a new objection to admissibility. In any event, it is enough to say that there was no exception to any part of the charge.

10. The sixteenth assignment of error is to the exclusion of the report and the supplemental report of Mr. Lanagan during the cross-examination of Dr. Longpre. We have discussed this question in connection with the seventh, eighth, and thirteenth assignments of error. No new point is presented.

11. The seventeenth assignment of error was to permitting Dr. Tadgell, superintendent of the Belchertown State School, who had been called as a witness by the Commonwealth, to testify on direct examination that in the preceding twelve years he had made approximately two hundred fifty determinations of men facing criminal complaints and indictments as to their ability to distinguish between right and wrong at the time of the commission of the crime. The defendant's entire argument on this point is that the testimony was irrelevant, and came from a witness who had not yet qualified as an expert. The testimony was relevant to the pending attempt to qualify the witness as an expert. His qualification, which occurred shortly thereafter, is the subject of the next assignment of error.

12. The eighteenth assignment of error is that the trial judge allowed Dr. Tadgell to testify as a mental expert.

This determination, it is argued, was an abuse of discretion. The argument is without merit. The witness, as we have seen, was superintendent of the Belchertown State School, an institution for mental defectives without psychosis. That position he had held since 1943. He became a physician in 1929, and had held various medical positions in State mental institutions until 1941, when he became assistant to the commissioner of mental health. For twelve years he had been making determinations of the criminal responsibility of defendants. For twenty-five years he had been actively connected with the study and practice of psychiatry in connection with his work. It is manifest that the judge could properly find that Dr. Tadgell was qualified to testify. No error of law appears. *Commonwealth* v. *Spencer*, 212 Mass. 438, 448.

13. The nineteenth and twentieth assignments of error are to the denial of the defendant's motion in each case for a directed verdict of not guilty by reason of insanity. There was no error in this respect. There was a conflict between the testimony of the medical experts testifying on behalf of the Commonwealth and that of those testifying on behalf of the defendant. Four such experts testified that the defendant was legally responsible on the evening of September 25, 1954, when he killed the two children. Two such experts testified that he was not. The issue was eminently one for the jury. In *Commonwealth* v. *Cox*, 327 Mass. 609, the only case cited by the defendant, the jury found the defendant guilty on the legal presumption of sanity in the face of the unanimous medical opinion that he was not sane. We found no error of law, but exercising our powers under G. L. (Ter. Ed.) c. 278, § 33E, as amended by St. 1939, c. 341, we held that the verdict was against the weight of the evidence and granted a new trial.

14. In accordance with our duty under the statute last cited we have reviewed the entire evidence and are of opinion that justice does not require a new trial. *Commonwealth* v. *McNeil*, 328 Mass. 436, 442.

*Judgments affirmed.*